UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 15-23737-MC-LENARD/GOODMAN

**SEQUIP PARTICIPAÇÕES S.A.,**

    Petitioner,

v.

**PAULO ROBERTO FRANCO MARINHO,**

    Respondent.
_____/

### ORDER DENYING RESPONDENT'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION (D.E. 35)

**THIS CAUSE** is before the Court on Respondent Paulo Roberto Franco Marinho's Motion to Dismiss for Lack of Personal Jurisdiction, ("Motion," D.E. 35), filed November 10, 2016. Petitioner Sequip Participações S.A. ("Petitioner" or "Sequip") filed a Response on April 17, 2017, ("Response," D.E. 84), to which Respondent filed a Reply on April 27, 2017, ("Reply," D.E. 92). Upon review of the Motion, Response, Reply, and the record, the Court finds as follows.

**I.  Background**

    **a.  Procedural history**

In 2010, Sequip, a Brazilian company, and Marinho, a Brazilian citizen, submitted to arbitration in Brazil to settle a dispute that arose out of a contractual agreement between the Parties. (Pet. to Confirm Arb. Award (D.E. 1) ¶¶ 1-2, 9-11.) On August 25, 2010, the Parties agreed upon and executed the "Terms of Reference" that would govern

the arbitration. (Id. ¶ 15.) Pursuant to Article 14.1 of the Terms of Reference, the losing party would bear all costs and expenses related to the proceedings. (Id.)

On October 9, 2012, the Arbitral Tribunal issued a unanimous Final Award rejecting all of Marinho's claims and ordering Marinho to "bear all the costs and expenses of arbitration," including reimbursing Sequip for amounts paid in advance to the arbitrator. (Id. ¶ 22-24.) Sequip's costs and expenses in the Brazilian arbitration, comprised of administrative and arbitrators' fees, totaled R$ 417,500.00[1] (US$ 158,046.00). (Id. ¶ 25.) The Arbitral Tribunal also awarded Sequip attorneys' fees and costs in the amount of R$ 1,000,000.00 (US$ 378,554). (Id. ¶ 26.)

According to Sequip, Marinho never satisfied the arbitration award. (Ex Parte Mot. for Prejudgment Writ of Attachment (D.E. 6) at 3.) Sequip initiated an investigation which revealed that Marinho had secreted his Brazilian assets in offshore bank accounts in Florida and the Cayman Islands, and had absconded to Florida. (Id.) The investigation also revealed that in 2012—when Marinho's assets were becoming almost untraceable—Marinho's wife, Adriana, received millions in assets that she did not have in 2011. (Id. at 4; Ramos Decl. (D.E. 7) ¶ 5.)

Sequip instituted an enforcement action against Mr. Marinho in Brazil and sought several writs of attachment. (Ramos Decl. ¶ 6.) Although the Brazilian courts granted Sequip's requests for enforcement and attachment, Marinho had already hidden his assets in Brazil and Sequip was unable to collect on the award. (Id.)

---

[1] Brazilian Real.

On October 6, 2015, Sequip filed a Petition to Confirm Arbitration Award in this Court. (D.E. 1.)

On October 8, 2015, Sequip filed an Ex Parte Motion for a Prejudgment Writ of Attachment against Marinho. (D.E. 6.) Therein, Sequip alleged that: (1) Marinho is the registered owner of a Rolls Royce "Ghost" sports car valued at $296,000.00; (2) the address associated with the sports car is owned by North Challenge Inc., which Sequip believes is one of Marinho's shell companies designed to hide his assets; (3) North Challenge Inc. was incorporated in Florida two months after the Final Award by the Arbitral Tribunal, and that same month purchased Unit 5391K at 5391 Fisher Island for $4,250,000.00 with a $2,535,000.00 mortgage; (4) the sole shareholder of North Challenge Inc. is North Challenge Corp. BVI, and Marinho's wife is the sole director of both companies; and (5) at the time Sequip filed the Motion for Prejudgment Writ of Attachment, the 5391 Condo was listed for sale at $13,800,000.00. (Id. at 4-5.) The Motion was supported by Declarations from Sequip's in-house counsel Denise Ramos, (D.E. 7), private investigator Christopher Weil, (D.E. 8), and attorney David M. Orta, (D.E. 13), and the exhibits attached thereto.

On October 17, 2016, Sequip served Marinho.[2] (See D.E. 33.) On November 10, 2016, Marinho filed the instant Motion to Dismiss for Lack of Personal Jurisdiction.

---

[2] According to Sequip's Ex Parte Motion to Reopen Case and for Service by Other Means Under Rule 4(f)(3), Sequip attempted to serve Marinho twenty-six times, but Marinho actively and successfully evaded service. (D.E. 31 at 1.) Therefore, the Court permitted Sequip to perfect service under Rule 4(f)(3) by sending the necessary documentation to Marinho's residence in Brazil, and by emailing the necessary documentation to Marinho and his attorney in Brazil. (D.E. 32.)

3

(D.E. 35.) On December 5, 2016, Sequip filed an Unopposed Motion for Jurisdictional Discovery, (D.E. 38), which the Court granted on December 6, 2016, (D.E. 40).

    **b.**    **Jurisdictional facts**

Petitioner has presented evidence that Mr. Marinho has been coming to Miami since 1995 and has owned at least three homes in the Miami area. (Marinho Dep. (D.E. 85-34) at 23:20.) In 1996, Mr. Marinho formed Costa Riviera Holdings Ltd., a British Virgin Islands company, for the sole purpose of purchasing unit 1501 at 300 South Pointe Drive in Miami Beach—the Portofino Tower condominium—for $526,000. (Property Records, D.E. 85-11; Interrogatory Resp. #10, D.E. 85-12; Marinho Dep. at 302:19 – 303:20.) Mr. Marinho sold Unit 1501 in 2001 through Costa Riviera for $900,000, after which the company ceased to exist. (Warranty Deed, D.E. 85-13; Marinho Dep. at 303:2-16.)

In February 2007, Mr. Marinho, through Blue Palm Capital Ltd, purchased Unit 19226C at 19226 Fisher Island Drive—the Seaside Condominium—for $2.17 million. (Property Records, D.E. 85-14; Marinho Dep. at 255:25 – 259:7; Interrogatory Resp. #10.) Blue Palm Capital was another British Virgin Islands company formed for the sole purpose of purchasing the condominium. (Marinho Dep. at 255:25 – 259:7.)

In July 2007, Mr. Marinho and his wife bought Unit 15221B of the Seaside Condominium for $1.2 million. (Property Records, D.E. 85-17.) The Marinhos bought the second unit to accommodate their four children. (Marinho Dep. at 262:14-20.) In September 2007, Blue Palm Capital and the Marinhos jointly obtained a $1.49 million mortgage from Regions Bank (Mr. Marinho's local bank) that was secured by both units

at the Seaside Condominium. (D.E. 85-15.) Mr. Marinho signed the mortgage both as an individual borrower and as a director of Blue Palm. (D.E. 15 at 15; Marinho Dep. at 253:12 – 254:6.)

Also in 2007, Mr. Marinho and his wife purchased an equity membership at the Fisher Island Club for $250,000. (D.E. 85-29.)

In October 2010, the Marinhos sold Unit 15221B of the Seaside Condominium for $1.025 million. (Warranty Deed, D.E. 85-20; Property Records, D.E. 85-17 at 8.) The proceeds of the sale went to Mr. Marinho's personal account in the United States and then to one of his accounts in Brazil. (Supp. Interrogatory Resp. #8, D.E 85-12.)

In May 2011, Blue Palm Capital sold Unit 19226C for $1.63 million. (Warranty Deed, D.E. 85-21; Property Records, D.E. 85-14 at 8.) Mr. Marinho testified that he and his wife sent the proceeds to one account in Brazil. (Marinho Dep. at 270:16 – 271:19.)

In December 2012, two months after Sequip obtained the arbitration award against Mr. Marinho, Unit 5391K at 5391 Fisher Island Drive ("the 5391 Condo") was purchased for $4.25 million by North Challenge Inc.—a Florida corporation whose sole director, president, and ultimate owner is Mr. Marinho's wife, Adriana. (Property Records, D.E. 85-22; Corporate Records, D.E. 85-23.) Although Mr. Marinho claims that he was a "guest" at the 5391 Condo, Mr. Marinho used the 5391 Condo as the local address listed on his Florida driver's license, for personal and business dealings, and to receive mail. (See Driver's License, Interrogatory Resp. #22, D.E. 85-1; Bank Statements, D.E. 85-3; Operating Agreement of Florida Agricultural Plastic Recyclers, LLC, D.E. 85-26 at 30.) He also had a utility bill in his name at that address, although he testified that the bill was

5

later changed to the name of his wife's company. (Marinho Dep. at 156:15-24.) Additionally, 5391 Fisher Island Drive is listed under Mr. Marinho's name on his Fisher Island Club account statement. (D.E. 85-8 at 11.)

On February 27, 2017, North Challenge Inc. sold the 5391 Condo for $8.1 million. (Marinho Dep. at 218:19 – 219:15; Property Records, D.E. 85-24.) Mr. Marinho claims to have no idea why or to whom the property was sold. (Marinho Dep. at 229:5-17.) Since then, Mr. Marinho has continued to stay in another condominium on Fisher Island that is owned by a corporation controlled by his wife. (Marinho Dep. at 235:8 – 237:22.) Mr. Marinho testified that his wife now makes the decisions regarding their Miami living arrangements, and will continue to do so in the future. (Id. at 315:13 – 317:11.)

Petitioner also presented evidence of Mr. Marinho's travel to Miami. According to I-94 travel history documents, Mr. Marinho has spent between one-and-a-half and three months per year in Miami since 2013.[3] The documents show the following arrival-departure dates:

1) May 19, 2013 to unknown;

2) October 13, 2013 to November 15, 2013;

3) December 2, 2013 to January 14, 2014;

4) January 19, 2014 to March 18, 2014;

5) June 20, 2014 to July 5, 2014;

---

[3] I-94 travel history documents only date back to 2013 because the Department of Homeland Security only began automating the customs admissions process on April 26, 2013. (See I-94 Records, D.E. 85-7.) DHS advises that I-94 travel history records may not reflect all arrivals and departures. Dep't of Homeland Security, U.S. Customs and Border Protection, I-94 Website FAQs, available at https://i94.cbp.dhs.gov/I94/#/home (last visited Sept. 27, 2018).

    6) December 13, 2014 to January 16, 2015;

    7) May 17, 2015 to June 30, 2015;

    8) October 19, 2015 to October 23, 2015;

    9) March 2, 2016 to April 16, 2016;

    10) December 24, 2016 to January 24, 2017; and

    11) February 23, 2017 to March 16, 2017.

(D.E. 85-7.) Additional records show that Mr. Marinho was in South Florida on dates not identified by the I-94 records. Specifically, his Fisher Island Club Account Statements show transactions personally linked to Mr. Marinho in time periods when his interrogatory responses and travel records do not indicate that he was present. For example, the Account Statements show a point of sale purchase at "Spa Internazionale" ascribed to "Marinho, Paulo" on January 28, 2016, (D.E. 85-8 at 13), and another point of sale purchase at the "Links at Fisher Island" ascribed to "Marinho, Paulo" on January 29, 2016, (id.). Mr. Marinho acknowledged these discrepancies and admitted that he was in Florida in January 2016, even though his I-94 records and interrogatory responses do not so indicate. (Marinho Dep. at 141:14 – 142:18.)

    Additionally, airline usage records produced under subpoena by Transmares Travel, Inc., a Florida-based travel agency, show that Mr. Marinho traveled to, from, or within the United States in January-February 2012, July 2012, July-August 2013, October 2014, February 2015, and December 2015. (D.E. 85-9.) None of these dates were reflected in Mr. Marinho's interrogatory responses or the travel records he produced. (Mot. at 8.) According to Petitioner, "[w]hen confronted with these gaps in the

7

information he had produced, Mr. Marinho confirmed one previously unreported trip, recognized various discrepancies between Transmares' airline usage records and his discovery responses, and blamed his travel agent for supposed mistakes (though he could not identify any in particular)." (Id. (citing Marinho Dep. at 94:9-24; 101:9-16 (confirming trip from Miami to Washington, D.C.); 95:13-96:5 (recognizing January 2012 discrepancy); 99:21-24 (recognizing February 2012 discrepancy); 107:13-19 (recognizing July to August 2013 discrepancy); 109:3-14 (recognizing October 2014 flight from Miami).)

In any event, the evidence presented by Petitioner shows that Mr. Marinho has spent time in Florida in 27 of the 48 months between April 2013 and March 2017.[4] (See Interrogatory Resp., D.E. 85-1; I-94 Travel History, D.E. 85-7; Fisher Island Club Account Statement, D.E. 85-8; Transmares Travel Agency records, D.E. 85-9; Brickell Travel Management records, D.E. 85-10.)

While in town, Mr. Marinho frequently takes advantage of his joint equity membership in the Fisher Island Club, which he has maintained since 2007 with annual dues of $20,330. (Membership Documents, D.E. 85-30; Account Statements, D.E. 85-8; Marinho Dep. at 27:13-17; 35:20 – 36:6; 80:7 – 81:11.) According to the club's website, a member's privileges include "access to South Florida's most exclusive seaside golf country club, racquet club, casual & fine dining restaurants, spa, salon & wellness center, marinas, private beach club, the Vanderbilt Mansion pool and access to the club's exclusive member events." (D.E. 85-30 at 2.) Mr. Marinho would use his membership at

---

[4] The instant Motion was filed in April 2017.

Spa Internazionale, to golf at the Links at Fisher Island, and to access the Fisher Island Beach Club, among other activities.  (See Account Statement, D.E. 85-8)

On November 7, 2016, Mr. Marinho's close friend Younis Zubchevich contacted Fisher Island Club on behalf of the Marinhos to ask about transferring the Marinhos' equity membership to North Challenge Inc.—the company controlled by Mrs. Marinho that previously owned the 5391 Condo.  (D.E. 85-2.)  Although this inquiry occurred two weeks after Petitioner served Mr. Marinho with the Petition to Confirm Arbitration Award, (see D.E. 33), Mr. Marinho denied knowledge of this communication at his deposition, (D.E. 85-34 at 292:21 – 293:6.)

Mr. Marinho has maintained a local checking account at Regions Bank since at least 2012.  (Bank Records, D.E. 85-3, 85-9.)  The bank statements are addressed to Mr. Marinho at the Fisher Island properties.  (Id.)  Before Petitioner attempted to serve Mr. Marinho with the Petition, hundreds of thousands of dollars flowed through Mr. Marinho's Regions Bank account—his bank statements show that he made hundreds of purchases and other withdrawals from his Regions account, and frequently made purchases exceeding $1,000.  (See id.)  The account is now virtually empty.  (D.E. 85-4.)

Furthermore, Mr. Marinho has retained the services of several attorneys in South Florida to represent him in civil disputes, business deals, property transactions, and investments.  (See D.E. 20, 21, 31.)  For example, in 2010, Mr. Marinho retained attorney Matthew Leto to defend him (and his wife) in a civil suit filed against them in state court by their downstairs neighbor who claimed to have suffered water damage after the Marinhos installed a hot tub on their patio.  (Court Docs., D.E. 85-18.)

Also in 2010, Mr. Marinho engaged attorney Hilary Langen to prepare a Warranty Deed to sell Unit 15221B of the Seaside Condominium. (D.E. 85-20.) In 2011, Mr. Marinho engaged attorney Christopher Langen to prepare a Warranty Deed to sell Unit 19226C of the Seaside Condominium. (D.E. 85-21.)

In 2014, Mr. Marinho retained Federico Goudie (and others at Hughes Hubbard & Reed) to set up a company called "Greeninvest," a British Virgin Islands company, which was formed for the purpose of investing in Florida Agricultural Plastics Recyclers ("FLAG"), a Florida limited liability company. (Marinho Dep. at 180:18 – 182:10; Emails, D.E. 85-31.) Mr. Marinho was the ultimate beneficiary of Greeninvest, through which he made a $550,000 investment and held a 35% interest in FLAG. (Interrogatory Resp. #14, D.E. 85-1; Notice of Capital Contribution, D.E. 85-5.) In December 2015—two months after Petitioner filed this lawsuit—Mr. Marinho sold all of his rights in Greeninvest to his close friend Younis Zubchevich for $100 "[b]ecause it was not a good investment." (Marinho Dep. at 182:21-22, 184:15-16; Stock Purchase Agreement, D.E. 85-6.)

Mr. Marinho also invested $100,000 in a Florida limited liability company called Ipanema Partners, LLC, and by virtue of this investment Mr. Marinho was a 50% owner of the business. (Interrogatory Resp. #14, D.E. 85-1.)

Mr. Marinho owned a 2013 Rolls Royce Ghost which was registered to the 5391 Condo in November 2013, (D.E. 85-32 at 10), but he sold it around the time this case commenced, (Marinho Dep. at 30:16 – 31:3). He also owned a 2009 Bentley Azure and a

10

2009 Rolls Royce Phantom, which were both registered to 19226 Fisher Island Drive. (D.E. 85-32 at 4-5.)

## II.     Legal Standards

When deciding the issue of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2), a court must conduct a two-part inquiry. Future Tech. Today, Inc. v. OSF Healthcare Sys., 218 F.3d 1247, 1249 (11th Cir. 2000).

> First, the court must determine whether the applicable state statute governing personal jurisdiction is satisfied. [Second, i]f the requirements of the long-arm statute are satisfied, then the court must inquire as to, (1) whether defendant has established sufficient minimum contacts with the state of Florida; and (2) whether the exercise of this jurisdiction over defendant would offend traditional notions of fair play and substantial justice.

Id. (citations and internal quotation marks omitted). Ultimately, the plaintiff bears the burden of proving personal jurisdiction. Sculptchair, Inc. v. Century Arts, Ltd., 94 F.3d 623, 627 (11th Cir. 1996).

"In the context of a motion to dismiss for lack of personal jurisdiction in which no evidentiary hearing is held, the plaintiff bears the burden of establishing a prima facie case of jurisdiction over the movant, non-resident defendant." Morris v. SSE, Inc., 843 F.2d 489, 492 (11th Cir. 1988) (citing Delong v. Wash. Mills, 840 F.2d 843, 845 (11th Cir. 1988); Bracewell v. Nicholson Air Serv., Inc., 748 F.2d 1499, 1504 (11th Cir. 1984)). "A prima facie case is established if the plaintiff presents sufficient evidence to defeat a motion for a directed verdict." Id. "Where, as here, the defendant submits affidavits to the contrary, the burden traditionally shifts back to the plaintiff to produce evidence supporting jurisdiction unless those affidavits contain only conclusory

assertions that the defendant is not subject to jurisdiction." Meier ex rel. Meier v. Sun Int'l Hotels, Ltd., 288 F.3d 1264, 1269 (11th Cir. 2002). Allegations in the complaint are accepted as true to the extent they are uncontroverted by defendant's non-conclusory affidavits or deposition testimony. Morris, 843 F.2d at 492. Where there is conflict between the parties' affidavits and deposition testimony, all reasonable inferences are drawn in favor of the plaintiff. Id. See also Consol. Dev. Corp. v. Sherritt, Inc., 216 F.3d 1286, 1291 (11th Cir. 2000); Madara v. Hall, 916 F.2d 1510, 1514 (11th Cir. 1990).

## III. Discussion

Florida's long-arm statute provides for two types of personal jurisdiction: (1) specific jurisdiction under Section 48.193(1), where a party's contacts with Florida relate to the cause of action, and (2) general jurisdiction under Section 48.193(2), where a party's contacts are unrelated to the litigation, but nonetheless constitute "substantial and not isolated activity within [Florida]."

Petitioner argues that Mr. Marinho's contacts with Florida are so substantial as to subject him to general jurisdiction under Section 48.193(2).[5, 6] (D.E. 84 at 5-19.) "'Substantial and not isolated activity' for the purpose of general jurisdiction means activity that is 'continuous and systematic.'" Rautenberg v. Falz, 193 So. 3d 924, 931

---

[5] Alternatively, Petitioner argues that the Court may exercise quasi in rem jurisdiction over Mr. Marinho's assets. (Id. at 19-20.)

[6] Although mentioned in Marinho's Motion to Dismiss, (D.E. 35 at 6), Petitioner does not argue that the Court may exercise personal jurisdiction under Federal Rule of Civil Procedure 4(k)(2), which provides: "For a claim that arises under federal law, serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant if: **(A)** the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and **(B)** exercising jurisdiction is consistent with the United States Constitution and laws."

(Fla. Dist. Ct. App. 2016) (quoting Wiggins v. Tigrent, Inc., 147 So. 3d 76, 85 (Fla. Dist. Ct. App. 2014)).  General jurisdiction under Florida's long-arm statute is coextensive with the "limits on personal jurisdiction imposed by the Due Process Clause." Fraser v. Smith, 594 F.3d 842, 846 (11th Cir. 2010) (citing Woods v. Nova Cos. Belize Ltd., 739 So. 2d 617, 620 (Fla. Dist. Ct. App. 1999)); see also Thompson v. Carnival Corp., 174 F. Supp. 3d 1327, 1333 (S.D. Fla. 2016).  Due process "requires that the defendant have minimum contacts with the forum state and that the exercise of jurisdiction over the defendant does not offend 'traditional notions of fair play and substantial justice.'" Mut. Serv. Ins. Co. v. Frit Indus., Inc., 358 F.3d 1312, 1319 (11th Cir. 2004) (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)).  An exercise of general jurisdiction comports with due process when a defendant's contacts with Florida are "so 'continuous and systematic' as to render [the defendant] essentially at home in the forum state." Daimler AG v. Bauman, 571 U.S. 117, 139 (2014) (quoting Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 919 (2011)).  "When the activities of the nonresident are of sufficient quality that it should in fairness expect to defend itself" in Florida, his contacts satisfy Florida's long-arm statute and the Due Process clause of the U.S. Constitution. Singer v. Unibilt Dev. Co., 43 So. 3d 784, 789 (Fla. Dist. Ct. App. 2010).

"The application of this standard necessarily involves the scrutiny of the activities of the nonresident over some period of time prior to the filing of the complaint.  The duration of this period is not subject to specific delineation." Id. at 788 (citation omitted). Rather, "[i]t depends upon such factors as the nature and intensity of the activity." Id.

The Parties failed to cite, and the Court failed to discover, any case law analyzing general jurisdiction over an individual whose contacts with Florida, while extensive, are primarily (although not exclusively) for pleasure. Indeed, the Court has found very few cases from any jurisdiction addressing general jurisdiction under facts similar to those in this case. However, the Court has identified two cases from federal appeals courts which are helpful.

First, in Trierweiler v. Croxton and Trench Holding Corp., the Tenth Circuit found that the defendant, former Secretary of the Interior, James Watt, was not subject to general jurisdiction in Colorado. 90 F.3d 1523, 1543 (10th Cir. 1996). In that case, the plaintiff alleged that Watt:

> (1) lived in Colorado from 1977–1981 (well before the events at issue here) and was then associated with a local legal foundation; (2) is admitted to practice law in the Tenth Circuit; (3) owned some property in Colorado; (4) has a joint bank account in Colorado; (5) travels here several times a year; (6) was a limited partner in a Colorado limited partnership until 1990; and (7) was a member of the proposed advisory board of Aesir, in which capacity he consulted the officers of C&T and received reimbursement for some travel expenses.

Id. The Tenth Circuit found the fact that Watt owned a joint bank account with his mother, belonged to the Tenth Circuit bar, lived in Colorado several years prior, and owned property in Colorado to be "highly attenuated" contacts. Id. It concluded that the "relatively small amount of business" Watt did in Colorado fell short of the continuous and systematic contacts necessary to confer general jurisdiction. Id.

Conversely, in Holt Oil & Gas Corp. v. Harvey, the Fifth Circuit Court of Appeals found that defendant Harvey, an Oklahoma resident, was subject to general jurisdiction in

14

Texas. 801 F.2d 773, 780 (5th Cir. 1986). The Fifth Circuit noted Harvey's substantial "general contacts with Texas," including:

> (1) Harvey attended college and was formerly employed in Texas; (2) Harvey owns real estate in Texas, specifically a condominium in Houston; (3) Harvey has travelled to Texas on numerous occasions to visit his children; (4) Harvey frequently visits Texas for recreation; and (5) Harvey has transacted a great deal of business in Texas. In addition to his transaction with Holt, Harvey has had extensive business dealings with Permian Records of Dallas, Texas. Harvey has been a director of Permian Records and has attended director's meetings in Dallas. Harvey has also invested $250,000.00 in Permian Records. Finally, Harvey is the sole shareholder of Marlin Oil Company. Marlin Oil has drilled several wells in Texas and been involved in litigation in Texas. Harvey has travelled to Texas on several occasions in connection with the activities of Marlin Oil.

Id. at 779. The Fifth Circuit opined that none of these contacts would be sufficient by themselves to subject Harvey to general jurisdiction in Texas, but when viewed together "they constitute the kind of continuous and systematic contacts required to satisfy due process." Id. See also Garner v. Phillips, Civil No. 04–6329–AA, 2006 WL 2021698, at *3-4 (D. Or. July 16, 2006) (finding that a party was subject to personal jurisdiction in Oregon because he misappropriated bank accounts and bonds issued in Oregon, used funds he misappropriated to purchase a vacation home in Oregon that he visited approximately six or seven times each year, and opened a bank account so that he could pay utilities and other expenses associated with the vacation home).

Here, Mr. Marinho has visited Miami several times every year for the past several years, often for more than a month at a time. He has owned several homes in Miami, personally and through holding companies. He has sold these homes for millions of dollars and retained attorneys to draft the warranty deeds to transfer the properties.

15

Before he was served with process in this case, Mr. Marinho spent a substantial amount of money from his local Regions Bank account while he was in town. He is a joint owner of an equity membership at the Fisher Island Club valued at $250,000 with annual dues of $20,330, which he uses extensively when he is in town. Mr. Marinho has a Florida driver's license. He has owned three luxury automobiles in Florida which were registered to the homes he is associated with on Fisher Island. He has invested in at least two Florida companies—a $550,000 investment for a 35% ownership stake in FLAG, and a $100,000 investment for a 50% ownership stake in Ipanema Partners, LLC. In 2016, Mr. Marinho sold his shares of FLAG to Mr. Zubchevich, a Florida resident.

When considering all of Mr. Marinho's contacts with Florida in toto, the Court finds that Mr. Marinho has engaged in "substantial and not isolated activity" in Florida. Rautenberg, 193 So. 3d at 931. Indeed, Mr. Marinho's contacts with Florida are "so 'continuous and systematic' as to render [him] essentially at home in" Florida. Daimler, 571 U.S. at 139 (quoting Goodyear, 564 U.S. at 919). His activities are of a sufficient quality that he should in fairness expect to defend himself in Florida. Singer, 43 So. 3d at 789. In fact, Mr. Marinho has defended himself in Florida. (See D.E. 85-18.) In December 2009, the Marinho's downstairs neighbor sued Mr. and Mrs. Marinho in the Eleventh Judicial Circuit in and for Miami-Dade County in Case No. 09-91498-CA-32, alleging water damage after the Marinhos installed a hot tub on their patio. (See D.E. 85-18.) The case ended in a Stipulation for Settlement requiring the Marinhos to remove the hot tub and make repairs to their unit. (Id. at 8-11.) As such, exercising personal jurisdiction over Mr. Marinho in Florida "does not offend 'traditional notions of fair play

16

and substantial justice.'" Mut. Serv. Ins. Co., 358 F.3d at 1319 (quoting Int'l Shoe, 326 U.S. at 316).

### III. Conclusion

Accordingly, it is **ORDERED AND ADJUDGED** that:

1. Paulo Roberto Franco Marinho's Motion to Dismiss for Lack of Personal Jurisdiction is **DENIED**; and

2. Respondent shall have fourteen days from the date of this Order to **SHOW CAUSE**, if any, why the Petition to Confirm Arbitration Award should not be confirmed pursuant to 9 U.S.C. § 207.

**DONE AND ORDERED** in Chambers at Miami, Florida this 16th day of October, 2018.

*[signature]*
**JOAN A. LENARD**
**UNITED STATES DISTRICT JUDGE**